# PARKER-WASHINGTON COMPANY et al., Appellants, v. JAMES R. DENNISON.

### Division One, April 8, 1913.

1. **PEREMPTORY INSTRUCTION: Effect: Admission of Facts.** A demurrer to plaintiffs' evidence, or a request for a peremptory instruction to find for defendant, admits every fact which the evidence tends to prove and every reasonable inference that may be drawn therefrom.

2. ——————: **Breach of Contract: Paving: Working Conjointly with Monopoly Competitor.** Plaintiffs entered into a contract with defendants, by which they sold to defendants a sufficient quantity of Trinidad Lake asphalt to pave 40,000 square yards, to be shipped to Kansas City and used in laying pavement in said city, and not otherwise. Plaintiffs owned a plant in said city, and the contract provided that the asphalt material should be prepared in said plant, and for that purpose, the contract declared possession and control of said plant were delivered to defendants until all paving contracts were completed. The contract also provided that defendants should not engage in any other line of asphalt work, or with other persons, directly or indirectly; that they were to bid on all Trinidad Lake asphalt contracts to be let by the city until they were awarded the 40,000 square yards, and plaintiffs were not to bid, directly or indirectly, on asphalt paving contracts to be let by the city, without defendant's consent; that defendants should not bid less than two dollars per square yard, without the consent of plaintiffs; and that upon the completion of any paving contract, the actual costs and expenses should be deducted from the money or tax-bills received, and the balance equally divided between plaintiffs and defendants. Prior to the time the contract was made the Barber Asphalt Paving Company had practically a monopoly of Trinidad Lake asphalt, and in Kansas City had no competition in bids for asphalt paving, but about that time, in some undisclosed way, plaintiffs became the owners of about 1000 tons of said material, of which 131 tons were in Kansas City, and the balance at Syracuse, New York. Prior thereto the Barber Company waged a vigorous industrial war on plaintiffs, and contended before the city authorities that plaintiffs had and could obtain no Trinidad Lake asphalt, and, when they were the successful bidders at from $1.70 to $1.80 per square yard, the city council refused to confirm their contracts, and that was done in pursuance to the false statements by the Barber Company that

plaintiffs' asphalt was not genuine Trinidad Lake. The city council's committee investigated, and found their asphalt was genuine, and thereafter contracts were awarded to them. Thereupon numerous suits were instituted by many property-owners against plaintiffs and the city engineer, to enjoin the confirmation of said contracts and the performance of the work thereunder, and these suits were procured to be brought by the Barber Company, which induced the property-owners to believe plaintiffs' material was spurious and not genuine Trinidad Lake asphalt, and also insured them against the payment of costs in those suits. It was under these conditions that the above contract for whose breach plaintiffs sue was made, and after its execution plaintiffs retired from the asphalt paving business in Kansas City. The uniform price bid by the Barber Company for paving had been and thereafter was $2.12 per square yard. After defendants entered into said contract, they put in numerous bids for paving, but where the amount of paving was only for a small number of square yards their bids were $2.08, $2.09 and $2.10, but for a large number of square yards their bids were $2.15 or none at all. None of their bids were confirmed, and they were not because defendants asked the city engineer to hold them back and not send them to the council, and the inference from the evidence is that they never intended to do any of the work that they had by the contract agreed to do. Because of the delay, and because numerous property-owners represented to the council committee that they would prefer to have the Barber Company do the work at $2.12 per square yard than defendants at $2.09 or $2.10, all the contracts were awarded to the Barber Company. The 1000 tons of asphalt at Syracuse were billed to Kansas City, but stopped at Chicago, and has never reached Kansas City. There is evidence from which it may be inferred that defendants were induced to make their bids at the price they did, and then to request a delay of the confirmation of the contract, by the Barber Company. Defendants made no attempt to operate the plant which the contract placed in their possession and control, nor otherwise to prepare the material. They represented to plaintiffs that they must have a large amount of work before they could obtain the necessary "Eastern backing," yet they avoided the larger contracts for paving, and it turned out later that the "Eastern backing" was the Barber Company, that the asphalt they did pay for was paid for with that company's money, and there is evidence to indicate that from the beginning the concerted plan between defendants and the Barber Company was to recapture the tons of asphalt which in some way had got away from that company, and to put plaintiffs' plant out of competition with that company. A ton of asphalt will pave from 100 to 110 square yards, and the

actual cost per square yard of the pavement would have been one dollar. *Held*, that plaintiffs' evidence made a *prima facie* case of a breach of the contract, and the court erred in giving a peremptory instruction to the jury to find for defendants.

3. **PRACTICE: Admitting Material Evidence After Close of Case.** Material evidence, offered by plaintiffs, after they have rested, and before the court has given a peremptory instruction to find for defendants, should be admitted. A failure through inadvertance or oversight to introduce material evidence should never be a legal bar to its introduction unless the case has proceeded to such a point, or the conditions have so changed, that an undue advantage would be acquired by the party offering it as a result of its admission.

Appeal from Jackson Circuit Court.—*Hon. Herman Brumback*, Judge.

REVERSED AND REMANDED.

*Ball & Ryland* for appellants.

(1) Plaintiffs made a prima-facie case on the evidence introduced. Ladd v. Williams, 104 Mo. App. 397. It is error to direct a verdict for the defendant even where only nominal damages would be recoverable under the evidence. Owen v. O'Reilly, 20 Mo. 603. (2) The doctrine is fundamental that for the purpose of deciding whether or not plaintiffs' case should be submitted to the jury, plaintiffs' testimony should be taken as true and every reasonable inference therefrom in their favor should be made. Ladd v. Williams, 104 Mo. App. 397. (3) The action of the court in sustaining the objection to plaintiffs' offer to show the worth and value of their plant during the season of 1898 was reversible error and an abuse of the court's discretion in such cases. Owen v. O'Reilly, 20 Mo. 603; Tierney v. Spiva, 76 Mo. 279. (4) The Supreme Court must examine all the evidence where it is all on one side to determine the question of the correctness of the court's action below in giving or refusing a peremptory instruction. Dunphy v. Stock Yards Co.,

118 Mo. App. 301; Hawk v. Railroad, 130 Mo. App. 658; Day v. Consolidated, etc. Co., 136 Mo. App. 274.

*Scarritt, Scarritt, Jones & Miller* for respondent.

(1) The defendants took two and one-half times the quantity of asphalt sold to them by the terms of the contract sued on and for all of it paid the contract price per ton stated in the contract, and full acknowledgment and satisfaction of the performance of the stipulation of the contract relative to the purchase of asphalt was acknowledged by the plaintiffs. Much of this asphalt was tendered to and purchased by the plaintiffs subsequent to the termination of the provision in the contract sued on, constituting a working arrangement, and therefore was not to be used and could not have been used in Kansas City under the terms of that contract. (2) The defendants never had, held or controlled the possession of the plaintiffs' plant even for a second. Under the terms of the contract sued on they had no right to such possession. The contract gave them no right to take or hold possession except for the purpose of preparing the asphalt material to be laid in fulfillment of contracts they might secure with Kansas City between May 14, 1898, and November 15, 1898. They never acquired any such contracts. They never claimed any right of possession of the plaintiffs' plant. The plaintiffs had the sole and exclusive possession of it during all the times referred to in the petition. The claim, therefore, for $50,000 damages because the defendants did not take possession of their plant or deprive them of the possession of their plant is preposterous. (3) The charge that plaintiffs were damaged in the sum of $50,000 by reason of the breach of the following stipulation of the contract, namely, "Upon the completion of any paving contract the actual cost and expense shall be ascertained by said parties, and such amount shall be deducted from the price received in cash, bonds, or

tax bills at their face, and the balance of such cash, bonds or taxbills shall be divided equally between the parties hereto," is without merit under the proof adduced by the plaintiffs, which shows that no pavement was ever completed under any contract or even begun because no such contract was ever entered into. It does not appear from the evidence that though one arose from the dead he could have persuaded the municipal authorities of Kansas City that defendants were the lowest and best bidder on a contract calling for a Trinidad Lake asphalt pavement. The outcome of the whole venture outlined in the contract sued on was purely speculative, and the plaintiffs were as much disappointed in the result of this their scheme to lay asphalt pavements in Kansas City by proxy as they had been in the direct attempt which they had assayed previously.

WOODSON, P. J.—This is a suit instituted in the circuit court of Jackson county, by the plaintiffs, to recover $105,000 damages from the defendants, for a breach of a written contract.

The suit was brought against James R. McIlvried and James R. Dennison, the defendants, but service not having been had upon the former, the cause, as to him, was dismissed, and proceeded with as to the latter.

Since, however, the contract was signed by both of them, and the matters and things complained of in the petition and evidence were transacted by both, in pursuance to the terms of the contract, we will refer to the defendant and respondent as the defendants and respondents, notwithstanding the dismissal as to McIlvried.

A trial was had before the court and a jury; and at the close of the introduction of the plaintiffs' evidence, the defendants requested a peremptory instruction telling the jury to find for the defendants, which

was by the court given; and in obedience thereto the jury returned a verdict for them; and thereupon the court entered judgment accordingly.

All necessary objections were made and exceptions saved to the rulings of the court; and after taking the proper preliminary steps therefor, the plaintiffs duly appealed the case to this court.

There is no question raised as to the sufficiency of the pleadings, and we will, therefore, pass them by with the remark that they were sufficient to present the questions involved in this case.

The contract sued on is quite lengthy, and for that reason it will not be copied in full.

Its provisions were substantially as follows:

The plaintiffs and appellants, on May 9, 1898, sold to respondents a sufficient quantity of Trinidad Lake Asphalt to lay forty thousand square yards, of street pavement, according to the plans and specifications of Kansas City, Missouri, to be delivered "where located" upon not less than five days' notice to the respondents of appellants' intention to make the delivery.

All of said asphalt "shall be shipped to Kansas City, Missouri," and shall be used in laying said pavement, and not otherwise.

"Said asphalt materials shall be prepared for use at appellants' plant in Kansas City, and the possession and control of said plant is hereby delivered to the respondents for that purpose, until September 15, 1898, . . . provided that if contracts aggregating 40,000 square yards of pavement have not been awarded to the defendants and confirmed by that date by the council, then the respondents should retain possession and control of said plant for said purposes for such time as may be necessary, up to November 15, 1898; and provided further that in case contracts shall have been confirmed prior to said November 15th, but not fully executed, then defendants should have the necessary

possession, control and use of said plant until the same have been fully executed.''

That the respondents should devote the necessary time and effort to execute the contract and should ''not engage in any other line of asphalt work or with other parties, either directly or indirectly, other than those interested in this contract during the existence of the same, and this contract shall be deemed to have been carried out and consummated upon completion of the 40,000 square yards of asphalt paving by the second parties (defendants) as herein indicated.

''The said second parties (respondents) agree to bid on all Trinidad Lake asphalt paving contracts to be let hereafter by Kansas City, Missouri, up to 40,-000 square yards, until they are awarded the 40,000 square yards, and said first parties (appellants) will not bid, directly or indirectly, on any Trinidad Lake asphalt paving contracts in Kansas City, Missouri, before September 15, 1898, without consent of said second parties (respondents), unless said second parties have been awarded and have confirmed the contracts for 40,000 square yards before September 15, 1898. In case said amount has not been awarded and confirmed by September 15, 1898, then said first parties (appellants) will not bid before November 15, 1898, unless said amount has been awarded and confirmed prior to November 15, 1898, except by agreement with said second parties.''

That in bidding upon propositions to do said work, respondents should not bid less than two dollars per square yard, without the consent of the appellants.

That respondents should keep a complete set of books showing the cost of all labor and material used in performing said contract, including vouchers for all money paid out; that said books and vouchers should be subject to the inspection of the appellants at all times and that upon completion of each paving

contract, a complete statement thereof should be made by respondents to appellants.

That respondents should pay to appellants five cents per square yard for all asphalt paving done under said contract, "said sum being in payment for the use of said plant and shall be paid by said second parties (respondents) without regard to profit or loss in the laying of any pavement and in no event shall be charged as any item of expense;" and "upon the completion of any paving contract the actual cost and expenses shall be ascertained by said parties and such amount shall be deducted from the price received in cash, bonds or taxbills at their face value and the balance of such cash, bonds or taxbills shall be divided equally between the parties hereto, but in the event of loss upon any contract such loss shall be borne by said second parties (respondents)."

That if the respondents "might desire to form a corporation in conjunction with at least one other person for the sole purpose of carrying out the requirements of this contract," they might so do, and that in such event it was agreed that the respondent might assign this contract to such corporation, also that the corporation "should have all the rights and be substituted to all of the liabilities of the second parties" (the respondents), and that in such case, "said second parties shall guarantee the payment for the asphalt sold them as herein set forth, and also the turning over to the first parties the profits for all work as herein mentioned and the five cents per square yard for all pavements made for use of plaintiff."

The evidence in this case is voluminous, covering about three hundred printed pages, which fact will prevent us from stating even the substance thereof, and consequently we will have to be satisfied by briefly stating what were the ultimate facts when the evidence introduced by the appellants, tended to prove, which were as follows:

That on and prior to the year 1897, the Barber Asphalt Paving Company, a corporation, had practically a monoply on Trinidad Lake asphalt; and until that time it had no competition in Kansas City, in bidding on proposals for contracts to do such paving; and that by reason of that monoply no other person, doing business in Kansas City, was able to obtain any of said material for that purpose.

That some time in the latter part of 1896 or the early part of 1897, the appellants became the owner of about one thousand tons of the material, one hundred and thirty tons of which were in Kansas City, and the remainder was located at Syracuse, New York; and about that time they began preparations to engage in that work in said city. It constructed a necessary plant for that purpose, and in the spring of 1897, it bid upon, and was, by Kansas City, awarded two or three contracts to do some small jobs of that character. Thereupon the Barber Company began a vigorous fight on appellants, and contended before the city authorities that the latter had no genuine Trinidad Lake asphalt, and could not procure any of that material for paving purposes, in that city.

At and prior to this time, the Barber Company had regularly bid $2.12 per square yard for that character of work, which netted it about one dollar a square yard. The appellants began by bidding, and continued to bid, from $1.70 to $1.80 for such work.

This fight waxed warmer until July, 1897, when the Public Improvement Committee gave the parties a hearing, and after investigation it reported to the city council, and advised that the contracts previously awarded to the appellants be not confirmed, and that its bids thereafter for all such work be rejected, "until said company produces satisfactory proof that it can procure the material so specified to the satisfaction of the city engineer and said committee."

Appellants declined to disclose the source from which it procured the 1000 tons of asphalt previously mentioned, and assigned as their reason for such declination that if disclosed the Barber Company would instantly destroy that source of supply, and that the only possible means by which that material could be procured was from that source.

That just prior to the date of the hearing had in July, 1897, a party in the employ of the Barber Company, for reasons not clearly appearing from the record, falsely stated to it, that the material proposed to be used by the appellants was not genuine Trinidad Lake asphalt; and that upon this statement alone the Improvement Committee of Kansas City advised that the contracts awarded to appellants be not confirmed, and that all its future bids be rejected as previously stated.

That appellants were not influenced in the slightest degree in its refusal to disclose the source of its material by any doubt as to the genuineness of the material, but for the sole reason previously stated.

That the city engineer investigated the charge that appellants' material was not genuine Trinidad Lake asphalt, and found that charge to be false, and so reported that fact to the Improvement Committee; and subsequently in September and October, 1897, a number of other contracts of this character were awarded to appellant.

Thereupon a number of suits were instituted in the circuit court of Jackson county by as many property-owners against the city engineer and the plaintiffs, to enjoin the confirmation of said contracts and the performance of the work called for thereby.

That these suits were procured to be brought through the influence and pernicious activity of the Barber Company, by insisting that appellants' material was spurious and not genuine Trinidad Lake asphalt. The evidence also tends to show that the

Barber Company in some manner, not made clear, insured those parties against the payment of the costs in those suits.

None of those cases were ever tried. They were dismissed just prior to the date of the contract involved in this case, but the costs were not paid by the plaintiffs therein.

Upon the contrary, the appellants, whenever it was the lowest and best bidder and could not procure a confirmation of the same, would, by mandamus proceeding, endeavor to have the contract awarded to them. In all these suits by and against the appellants and in all the hearings had before the improvement committee and the city engineer, the controlling and main question was, whether the material proposed to be used by the appellants was genuine Trinidad Lake asphalt. That all of these suits and proceedings were participated in by the Barber Company, and that its paramount object was to convince the courts, the city council, the improvement committee, the city engineer and the citizens in general owning property in Kansas City, that the materials of appellants was spurious and not genuine Trinidad Lake asphalt.

It was under these conditions that the contract involved in this case was made and entered into by and between the appellants and the respondents, which bears date, May 9, 1898.

That appellants not only delivered to respondent sufficient asphalt to pave 40,000 square yards of pavement, according to the requirements and specifications of Kansas City, but it delivered thereunder sufficient to pave 100,000 square yards. That none of this asphalt was shipped to Kansas City, notwithstanding the contract provided that none of it should be used elsewhere or in any other work than that mentioned in the contract; that is, that part thereof which was to be used in paving the 40,000 yards mentioned in the contract.

That the Barber Company furnished the money with which all of this asphalt was paid for.

That the respondents never laid a foot of pavement called for by the contract, nor performed any of the contracts awarded to them by the city engineer. That none of these contracts was confirmed because the respondents requested that they be not sent to the city council for confirmation.

That the contract in question delivered possession and control of appellants' asphalt plant to respondents, and bound it not to engage in that business in Kansas City during the life of the contract.

The first letting of contracts of the character in question, by the Public Improvement Committee, was held May 14, 1898.

No one bid therein except the Barber Company and the respondents. On that day, the following bids were made, received and opened, viz:

| Street. | | Sq. Yds. | Defendants' Bid. | Barber Company's Bid. |
|---|---|---|---|---|
| 1. Sixth Street | (p. 26) | 6145 | $2.09½ | $2.12 |
| 2. Seventh Street | (p. 26) | 2865 | 2.09 | 2.12 |
| 3. Bales Avenue | (p. 27) | 2067 | 2.09 | 2.12 |
| 4. Forest Avenue | (p. 28) | 7110 | 2.15 | 2.12 |
| 5. Prospect Ave. | (p. 28) | 33078 | 2.15 | 2.12 |
| 6. Mercier Place | (p. 28) | 3443 | 2.08 | 2.12 |
| 7. S. W. Blvd. | (p. 40) | 6669 | No bid | 2.12 |
| 8. S. W. Blvd. | (p. 41) | 14674 | No bid | 2.12 |

It is shown by the record that these bids, No. 1, Sixth street, was carried over to June 22nd without any award being made; that contracts numbered 2, 3 and 6 were carried over to May 28th and awarded to

the defendants on that date. These awards to the defendants were each annulled and the contract awarded to the Barber Company July 25, 1898.

On June 22, 1898, there was another letting of thirteen contracts:

| | Street. | | Sq. Yds. | Defendants' Bid. | Barber Company's Bid. |
|---|---|---|---|---|---|
| 1. | Brooklyn Ave. | (p. 31) | 1156 | $2.09 | $2.12 |
| 2. | Tracy Ave. | (p. 31) | 2917 | 2.09 | 2.12 |
| 3. | 17th Street | (p. 32) | 2100 | 2.08 | 2.12 |
| 4. | Broadway | (p. 32) | 1433 | 2.09 | 2.12 |
| 5. | Broadway | (p. 32) | 1934 | 2.09 | 2.12 |
| 6. | Euclid Ave. | (p. 33) | 869 | 2.09 | 2.12 |
| 7. | 16th St. | (p. 33) | 920 | 2.08 | 2.12 |
| 8. | Forest Ave. | (p. 41) | 8895 | No bid | 2.12 |
| 9. | College Ave | (p. 41) | 4132 | No bid | 2.12 |
| 10. | 12th Street | (p. 41) | 5270 | No bid | 2.12 |
| 11. | 12th Street | (p. 42) | 7860 | No bid | 2.12 |
| 12. | Park Avenue | (p. 42) | 2373 | No bid | 2.12 |
| 13. | 13th Street | (p. 42) | 1611 | No bid | 2.12 |

That defendants were the low bidders on contracts above numbered 1 to 7, both inclusive. No award was made on this bidding until August 15th, when all of the contracts were awarded to the Barber Company. The other contracts numbered from 8 to 13, both inclusive, on which the defendants did not bid at all and the Barber Company was the only bidder, were awarded to that company at the time, June 22nd.

On July 7, 1898, three contracts were let and awarded to the Barber Company as follows:

| Street. | | Sq. Yds. | Defendants Bid. | Barber Company's Bid. |
|---|---|---|---|---|
| 1. 12th Street | (p. 34) | 18400 | $2.10 | $2.12 |
| 2. Prospect Ave. | (p. 42) | 4942 | No bid | 2.12 |
| 3. Forest Ave. | (p. 42) | 5718 | No bid | 2.12 |

On August 4, 1898, three contracts were let as fol- lows:

| Street. | | Sq. Yds. | Defendants' Bid. | Barber Company's Bid. |
|---|---|---|---|---|
| 1. Euclid Avenue | (p. 34) | 3435 | $2.10 | $2.12 |
| 2. Virginia | (p. 34) | 1112 | 2.10 | 2.12 |
| 3. Eleventh Street | (p. 35) | 11830 | 2.10 | 2.12 |

All were awarded to the Barber Company on August 4th. As has been stated, three small contracts were awarded defendants on May 28th under the letting of May 14th and one larger contract, Sixth street, had been carried over to June 22nd without any award being made. They entered into the three contracts that were awarded, made their bond, and lodged them with the city engineer, Mr. Wise, whose duty it was to send them to the council for confirmation. Dennison was managing the matter of bidding, while McIlvried was generally away. Wise says: "McIlvried requested me to hold up these contracts for confirmation by the

council, as he was out of the city, until I could hear further from him.'' Again: ''These three contracts were not sent to the council. They were held back from being sent to the council at this request of Mr. McIlvried, as I recall it until he returned to Kansas City.'' On July 13, 1898, McIlvried wired the engineer: ''Please hold up awarding of our contracts ten days longer as it is impossible for us to make our arrangements before then.'' Wise said he did hold them for the ten days, and on July 25th, two months after they were awarded, they were annulled by the committee and awarded to the Barber Company. Why? Wise states: That defendants, after giving the notice not to have the contracts sent into the council, never asked him to have them confirmed or to send them to the council for confirmation; ''I do not recall anything that they said to the Public Improvement Committee in session, but to myself and other members of the committee they said that they could not afford to enter into a contract for a few small—or do the work on a few small—contracts unless they could get other contracts which would warrant them in building a plant; that is my recollection of it.'' McCormick says: ''I heard members of the committee on several occasions in their meetings, state that if Dennison and Company were bidding in good faith they would not bid within two cents of what the Barber Asphalt Paving Company bid, but would cut the price and make actual competition, and that they had no faith in bidders bidding so close. . . . They accused Dennison and Company after their bids were accepted of not allowing the contracts to go to the council and of not having bonds executed and delivered to the city after contracts were awarded to them. Within ten days after they filed their first bids they were simply stringing the city.'' Asked what, if anything, defendants said about this, he states: ''They made several excuses. One was that unless they could secure a large quantity

of work they did not want any of it, and that the people they were trying to get behind them had not given them the support up to that time that they needed.''

Ex-Alderman and Ex-Mayor Beardsley says: ''My best recollection is that the statement was made to us that unless they could get a sufficient quantity of work to justify them in beginning they did not want the contracts and for that reason we, seeing that the work was not being done, cancelled these contracts; that is my best recollection about it.'' Again: ''I cannot remember that there was any statement made by them that they had a plant; my best impression is that that was to be brought here; that that was one of the reasons why they did not want just a few contracts.''

Ex-Alderman Brown says: ''My recollection is that Mr. Dennison, a month or so after the awards were made to them of certain contracts (these first three or four that I spoke of) told me that, unless the committee would recognize them as the lowest and best bidder on the contracts they were bidding on generally, they could not afford to go to the expense of bringing a portable plant here to fulfill these contracts or any other contracts. . . . Some of the property-owners came before the committee and stated that their (defendants') bid was so near to that of the Barber Asphalt Paving Company, whose petition for the work these property-owners had signed, that they would just as soon have the work done by the Barber Company, even at the little higher price, because of the fact that they knew by their experience in the past that the Barber Company would do the work. . . . It was stated that they had failed in doing their work before that had been awarded to them; that they had not started the actual laying of the pavement on the street. My recollection is that they had not presented the ordinance for such work, which was the confirmation of the contract. And the property-owners argued before our committee that they were not prepared to

do the work." Again: "I don't think they claimed they had a plant, but I think they made the claim that if all of the contracts were awarded to them they would bring a portable plant here."

McCormick says: "On several occasions in our conferences I insisted that they should bid low and told them that we would waive the point in our contract of not bidding below two dollars per square yard without our consent and requested them to bid as low as a dollar and seventy-five or eighty cents and let the public and the citizens know there was actual competition and not hold the price up to two:ten and not give the Barber Company or property-owners a chance to use that as an excuse for not having competition." And again: "I made several appeals to them to go out on the streets and call on the property-owners and explain to them that they had Trinidad Lake asphalt and that they were prepared to furnish an asphalt plant and that they were acting in good faith, or, if they would not go themselves, to employ one or two men to do the work for them; that they were being confronted with this position and that they ought to become active in showing the property-owners that they were acting in good faith and intended to make competition.

"Q. What did they say to that? A. They said they did not care to go into that work and did not care to employ anyone to do the work; that if the city would not make the award to them at 2.10 it was not their fault; that they would file those bids and let it rest on those bids."

Again: "I insisted that they should file bonds for the first three contracts with the council and apply to the city officials, the councilmen, to confirm the contracts, and let them know that they were acting in good faith, and to proceed with their work. They said they were not concerned with the city council; that

they did not want to put their contracts in and would not put them in unless they got a large quantity of awards.''

He states that he saw Dennison in regard to McIlvried's telegram to Engineer Wise of July 13th. ''I went to Dennison's office and protested about the telegram and told him it was only delaying and playing us for time and I insisted that they should have those contracts go to the council for confirmation. Q. What did he say? A. He said he would have to wait on Mr. McIlvried's actions in the East; that he was the man who was working with the Eastern parties and until he advised them to proceed he could not do anything.''

Ex-Alderman Jewell says: ''I have a faint recollection that Dennison and Company had not entered into the contracts, but it is rather hazy now; that the work was being delayed and the improvement not being made and that was the reason for rejecting the contracts.''

As to the lettings on June 22nd this witness says: ''I do know that the Dennison Company was there and were bidders, and my best recollection tells me that the reason why they did not get these contracts finally was because the first contracts that were let to them they did not come in and do the work and simply delayed the improvements; that is my recollection of it.'' In answer to questions of defendants' counsel as to his vote he says: ''It seems to me I voted for those people until I found—there was some reason why—I think it was because they were not doing the work, or something of that kind.''

Shortly after the contract of May 9th, McIlvried and appellant, David McCormick, went to Syracuse, arriving there May 15th. In July, 1898, ninety-one tons of the 725 tons of asphalt at Syracuse were delivered and paid for by the defendants, and David McCormick attended to the shipment of it, routing it from Syra-

cuse to Kansas City by way of Chicago. It was stopped in Chicago and remained on the docks there for months. It never came to Kansas City. The remaining 634 tons were not accepted until May, 1899, being billed to the defendants May 18th. McIlvried then assured McCormick that the asphalt would be shipped to Kansas City; that they would begin bidding at the next letting in Kansas City and that their backing would be the Columbian Construction Company. McCormick says: "I insisted that all of the asphalt that had been shipped out of Syracuse should be sent to Kansas City, including the shipments of 1898 and the shipments of 1899. Then I insisted on them bidding on contracts in Kansas City, and McIlvried answered that Dennison was then willing—wanted the contract to be executed without any modification, though they had made a request for a number of modifications giving them the right to ship this asphalt to some other territory in the west." Again: "They assured me that the asphalt would go to Kansas City and that they would bid on contracts and carry out their contract with us." Again: "Mr. McIlvried advised me that Mr. Dennison was in the employ of the Columbian Construction Company, handling the work at Kansas City."

Defendants never did pay for and take the 127 tons of material at appellants' plant. This, however, seems to be in conflict with the great weight of the evidence. On the occasion of taking the 634 tons and paying for the same McCormick says that McIlvried told him that he had secured an option on the Columbian Construction Company in the fall of '98 and they had requested him to spend the winter South and return and arrange to buy the Columbian Construction Company for the Philadelphia parties; that he had "kept the names of their backers away from us until this date; that he felt he could not give us their names." David McCormick states: "Mr. McIlvried stated to me that he was acting for the officers of the Barber

Asphalt Paving Company in the purchase of the Columbian Construction Company,'' and that he told him this ''after the transfer had been made by the holders of the Columbian Construction Company, at Syracuse, to McIlvried and the Philadelphia parties who purchased the Columbian Construction Company.''

That a ton of asphalt will lay from one hundred to one hundred and ten square yards of pavement. Taking the smaller estimate, these defendants from the date of the execution of the contract had control of 127 tons in the plant, which would have laid 12,700 square yards, and of 725 tons at Syracuse, which would have laid 72,500 square yards, or a total of more than 85,000 square yards. That the actual cost per square yard of laying this pavement according to Kansas City specifications was at that time from one dollar to one dollar and five cents, which would make a profit of from ninety to ninety-five cents a square yard. On 40,000 yards, aside from the five cents per square yard which at all events was to be paid for the use of the plant, the damage to appellants by reason of this breach of the contract on the part of defendants, if a breach there was, would be nearly twenty thousand dollars, aside from the question of whether under the terms of the contract appellants would not be entitled to half of the profits on the entire yardage which the asphalt sold would lay.

There was much more evidence of the same character, but we can see no useful purpose to be served by going further into the details thereof.

After the peremptory instruction was asked by counsel for respondents, but prior to the court's giving the same, counsel for appellants requested permission to show what its asphalt plant was worth in the working season of 1898. This was objected to by counsel for respondents, which was by the court sustained, and appellants duly excepted.

I. There are but two legal propositions presented by this record for determination, and they are: First, that the court erred in giving over the objection of counsel for appellants the peremptory instruction telling the jury to find for the respondents; and, second, that the court erred in not permitting appellants to prove the value of the asphalt plant mentioned in the contract involved in this case.

We will dispose of these propositions in the order stated.

As to the first: It is elementary that in asking a demurrer to the evidence, or requesting a peremptory

**Peremptory Instruction: Admission.** instruction telling the jury to find for the defendant, thereby is admitted as true every fact of which there is evidence tending to prove, and every reasonable inference which may be drawn therefrom.

[Ladd v. Williams, 104 Mo. App. 390, l. c. 397; Owen v. O'Reilly, 20 Mo. 603.]

What facts does the evidence tend to prove, and what are the inferences that may be drawn therefrom? Substantially, they are as follows:

That the contract mentioned in the evidence was duly made and entered into by and between the appellants and the respondents; that at the time

**Breach of Contract: Prima Facie Case.** of its execution appellants had an asphalt plant in Kansas City, Missouri, which it was agreed, tacitly at least, between the parties, was ample for the purpose of preparing the material to be used in making the pavements mentioned in the contract, and that by the terms of the contract the possession and control thereof was delivered to the respondents; that appellants had on hand, at the date of the execution of the contract, about one thousand tons of genuine Trinidad Lake asphalt, about one hundred and thirty tons of which were at the plant in Kansas City, and the remainder was in

Syracuse, New York; and that appellants, upon the execution of the contract, retired from the asphalt paving business in Kansas City as per the contract agreement.

That shortly after the execution of the contract the respondents were awarded some two or three contracts to do some small asphalt paving jobs, but they were never confirmed by the city council for the reason that the bids were held up for several months at their request, for the reason assigned to the city authorities, that they wanted to wait until they could procure contracts for a large amount of such work, in order to justify them in building or moving their asphalt works to Kansas City; and that respondents at that time had the possession and control of the appellants' plant, which was ample for the purposes indicated. The inference to be drawn therefrom is, that they never intended to do that or any other work of the character agreed to in the contract, which is shown by the insincere excuse offered for not wanting the contracts awarded to them, confirmed.

That in consequence of this delay said contracts were finally awarded to the Barber Company, and were subsequently performed by it.

This intention of respondents not to construct any of the pavement mentioned in the contract, is also shown by their repeated statements to the effect that they did not want their contracts for work confirmed by the city council until they could secure contracts for a large amount of such work, which would enable them to get financial backing from "Eastern parties," yet their bids show that when they came to bid on the contracts for the large jobs they either did not bid at all, or when they did bid, their bids were higher than those of the Barber Company's, which were $2.12 per square yard, the price it had always bid, even without competition.

By this conduct respondents did not procure any

of the contracts for doing either the large or small jobs, but the Barber Company was thereby enabled to procure all of them at their old monopolistic price, namely, $2.12 per square yard.

This company, in so far as this record is concerned, never changed its bids, on account of this supposed competition, or for any other reason for that matter.

The inference might naturally be drawn therefrom, that respondents did not want those contracts; also that the Barber Company may have had some knowledge of that fact, which caused it to bid its usual price, $2.12 per square yard.

Especially may this inference be drawn where the evidence tends so strongly to show that the respondents' "Eastern backers" were none other than the Barber Company, who furnished the money with which this one thousand tons of asphalt purchased of appellants by the respondents was paid for.

The evidence also tends to show that the respondents were co-operating with the Barber Company all the time, in trying to recapture, as it were, this one thousand tons of asphalt, which had slipped through its hands.

Respondents contracted to use this asphalt on the work to be done under contracts between them, and Kansas City, and nowhere else, yet in the very teeth of that contract, they obtained the entire one thousand tons and never used a pound of it in Kansas City, not even the one hundred and thirty tons which was delivered to them at the plant by the terms of the contract; and the remainder of it was shipped to Chicago, and that was the last heard of it.

The inference is that the respondents procured this asphalt, not for the purpose of laying pavements in Kansas City, but for the purpose of preventing its being used there by the appellants.

Much sidelight is thrown upon this case by the

conduct of the Barber Company in appearing before the city council, public improvement board, the city engineer, and by instigating litigation against city authorities to enjoin them from awarding to respondents the few contracts in which they were the lowest and best bidders, upon the alleged ground . that the asphalt with which they intended to do the work was spurious and not genuine Trinidad Lake asphalt, and who at the same time was backing respondents and furnishing the money with which to purchase this material.

Moreover, if this was spurious material why did the Barber Company want it? I never before heard of a party who was dealing in a genuine article, going out and purchasing a spurious article which was being sold for the genuine, and paying full price therefor. My observation has been that in such cases, the person owning the genuine article, brings injunctions directly against the party who is handling the spurious article and selling it for the genuine, and does not proceed against each and every contractor who may purchase the spurious article from the defrauder.

One of the strongest facts which the evidence tends to prove, and from which the inference is deducible, is that respondents at no time during the period covered by their contract ever made a bid which any fair-minded, disinterested man could say was in reality a competitive bid against the Barber Company, or anyone else, for that matter. In nearly every instance their bid was only one or two cents per square yard lower than that of the Barber Company, and in some two or three instances it was a few cents higher, notwithstanding the fact that appellant had given them express permission to bid as low as $1.70 to $1.80 per square yard; and that, too, in the face of the uncontradicted evidence which tended to show that the net profit was about one dollar a square yard.

There are numerous other facts and circumstances

shown in the evidence which might be commented upon, which tend to show that respondents entered into this contract with the intention of not complying with its provisions, but with the intention to get possession of appellants' supply of asphalt and thereby prevent them from bidding and stifle all competition with the Barber Company; and judging from this evidence alone, which of course is one-sided, there can be no reasonable doubt but what that was the design of both the Barber Company and the respondents, but upon a full hearing, when the evidence of the other side is all in, a very different case may be presented.

But as the case stands, we are firmly of the opinion that the evidence made a *prima facie* case for the appellants, and we therefore rule that the action of the court in giving the peremptory instruction to find for the respondents was reversible error.

II. Attending the last proposition presented, namely, that the court erred in not permitting appellants to show the value of the asphalt plant, mentioned in the contract, after they had closed their case, but prior to the giving the peremptory instruction, we have this to say: If that evidence was material then the trial court clearly erred in not permitting that fact to be shown.

The mere fact that counsel through inadvertence or oversight omits to introduce certain material evidence, should be no legal bar to his right to do so when his attention is called to the fact, unless the case has proceeded to such a point, or the conditions have so changed, that an undue advantage would thereby be acquired by him over his adversary.

But as this record stands, I am unable to see in what way that evidence was material, but I can see how it might be, upon a full presentation of the case, which was not made, and probably could not have been done under the condition in which the record was presented to this court.

If, however, it should become so in the next trial, then the trial court can correct its own error, if error it was.

We are, therefore, of the opinion that the judgment of the circuit court should be reversed, and the cause remanded for another trial; and it is so ordered.

All concur, except *Bond, J.,* not sitting.